1

2

3

4                    UNITED STATES DISTRICT COURT

5                        DISTRICT OF NEVADA

6   VINCENT PINDER,                          3:13-cv-00572-MMD-WGC

7                              Plaintiff,    **REPORT & RECOMMENDATION OF**
                                             **U.S. MAGISTRATE JUDGE**
8        v.
                                             Re: ECF No. 66
9   RENEE BAKER, et. al.,

10                            Defendants.

11

12          This Report and Recommendation is made to the Honorable Miranda M. Du, United

13   States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to

14   28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4. Before the court is

15   Defendants' Motion for Summary Judgment. (ECF No. 66, and Suppl. at ECF No. 72.)[1] Plaintiff

16   filed a response (ECF No. 76) and Defendants filed a reply (ECF No. 77).

17          After a thorough review the court recommends that the motion be granted in part and

18   denied in part.

19                              **I. BACKGROUND**

20          At all relevant times, Plaintiff was an inmate in the custody of the Nevada Department of

21   Corrections (NDOC). (Pl.'s Compl., Doc. # 4.) He is a pro se litigant and brings this action

22   pursuant to 42 U.S.C. § 1983 concerning conduct that occurred while he was housed at Ely State

23   Prison (ESP). (*Id.*) Defendants are: Renee Baker, Terrance Deeds, Glenn Hammock, Ronnie

24   Montoya, William Moore, Brian Mullins, Curtis Rigney and April Witter. (*See id.;* Screening

25   Order, ECF No. 3.)

26          Plaintiff was allowed to proceed with the following claims: (1) First Amendment

27   retaliation claims against Mullins in Count I; (2) First Amendment retaliation claims against

28
_____

[1] Refers to court's electronic case filing (ECF) number.

Witter in Count II; (3) an Eighth Amendment excessive force claim in Count III against Rigney, Montoya, Hammock, and Deeds; (4) a First Amendment retaliation claim in Count IV against Moore; and (5) a supervisory liability claim against Baker. (ECF No. 3.)

Defendants move for summary judgment as to each of Plaintiff's claims.

## II. LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A), (B).

If a party relies on an affidavit or declaration to support or oppose a motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

In evaluating whether or not summary judgment is appropriate, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine dispute as to a material fact; and (3) considering the evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect

1   the outcome of the suit under the governing law will properly preclude the entry of summary

2   judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.* at 248.

3        In deciding a motion for summary judgment, the court applies a burden-shifting analysis.

4   "When the party moving for summary judgment would bear the burden of proof at trial, 'it must

5   come forward with evidence which would entitle it to a directed verdict if the evidence went

6   uncontroverted at trial.'...In such a case, the moving party has the initial burden of establishing

7   the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp.*

8   *Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations

9   omitted). In contrast, when the nonmoving party bears the burden of proving the claim or

10  defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate

11  an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party

12  failed to make a showing sufficient to establish an element essential to that party's case on which

13  that party will bear the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-

14  25 (1986).

15       If the moving party satisfies its initial burden, the burden shifts to the opposing party to

16  establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v.*

17  *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a genuine dispute of

18  material fact, the opposing party need not establish a genuine dispute of material fact

19  conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a

20  jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc.*

21  *v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation

22  omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the

23  non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith*

24  *Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The nonmoving party cannot avoid

25  summary judgment by relying solely on conclusory allegations that are unsupported by factual

26  data. *Id*. Instead, the opposition must go  beyond the assertions and allegations of the pleadings

27  and set forth specific facts by producing competent evidence that shows a genuine dispute of

28  material fact for trial. *Celotex*, 477 U.S. at 324.

That being said,

[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

At summary judgment, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine dispute of material fact for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-50 (citations omitted).

### III. DISCUSSION

**A. Count I- Retaliation against Mullins**

**1. Allegations**

In Count I, Plaintiff alleges that on March 8, 2013, he filed a grievance against Mullins for abusive language and for failing to follow the code of ethics. (ECF No. 4 at 6.) On March 16, 2013, he filed another grievance against Mullins. (*Id*.) On March 30, 2013, he claims that Mullins and another officer retaliated against him by searching his cell and seizing his legal work. (*Id*.) On March 31, 2013, Plaintiff filed grievances against Mullins. (*Id*.) On April 11, 2013, Mullins searched Plaintiff's cell again. (*Id*.) Plaintiff filed additional grievances against Mullins on April 13 and 17, 2013. (*Id*.) On May 11, 2013, Mullins searched Plaintiff's cell in retaliation for filing grievances against him, and took all of Plaintiff's blank grievance forms. (*Id*.) On May 23, 2013, Baker sent a caseworker to speak to Plaintiff about his grievances against Mullins. (*Id*. at 6-7.) On May 24, 2013, prison officials returned the legal work Mullins had taken from Plaintiff. (*Id*. at 7.) On May 25, 2013, Mullins searched Plaintiff's cell. (*Id*.)

**2. Defendants' Argument**

Defendants argue that a search of every cell is required at a minimum once a month. (ECF No. 66 at 10, ECF No. 66-2; Mullins Decl, ECF No. 66-3 ¶ 6.) Defendant Mullins asserts

that all cell searches he conducted of Plaintiff's cell were in accordance with this policy, and the policy that all inmates are subject to search at any time. (Mullins Decl., ECF No. 66-3 ¶ 6.) Mullins maintains that he does not process or handle inmate grievances, and prior to seeing Plaintiff's complaint in this action, was not aware that Plaintiff had filed grievances against him. (*Id*. ¶ 8.)

According to Mullins, on March 30, 2013, a search was conducted in Plaintiff's cell, and it was discovered that a laundry bag was being used as an exercise weight bag, and it was removed from the cell. (Mullins Decl., ECF No. 66-3 ¶ 9.) It will filled with unknown items and paper and was knotted and tied so tightly it could not be opened to be searched. (*Id*.) It was sent to the property room to be searched. (*Id*.)

 Mullins does not recall removing blank grievance forms from the cell during the May 11, 2013 search, and if any forms were taken it would have been because there was an excessive amount. (*Id*. ¶ 10.)

On May 25, 2013, searches were conducted on multiple cells, including Plaintiff's. (*Id*. ¶ 11.) A cardboard box marked legal by the law library was removed because it was being used as storage for non-legal materials, and there were no legal books or documents in the box. (*Id*.) It was removed from the cell because it was not being used for its intended purpose. (*Id*.)

Plaintiff asserts that he filed grievances on March 8 and 16, 2013, and April 13 and 17, 2013, and his cell was searched on March 30, April 11, and May 11, 2013. Mullins points out that the searches occurred more than a week after he filed the grievances. Mullins maintains that Plaintiff cannot establish any correlation between the filing of the grievances and the cell searches.

### 3. Plaintiff's Response

Plaintiff reiterates that on March 8, 2013, he filed a grievance against Mullins. (ECF No. 76 at 2; Pl.'s Ex. 1, ECF No. 76 at 48-54.) On March 16, 2013, he filed another grievance against Mullins. (ECF No. 76 at 2; Pl.'s Ex. 2, ECF No. 76 at 56-67.) He asserts that he filed a third grievance against Mullins on March 30, 2013 after Mullins searched his cell on March 10, 2013, and March 30, 2013. (ECF No. 76 at 3; Pl. Decl, ECF No. 76 at 42 ¶ 5; Pl.'s Ex. 3, ECF No. 76

1    at 69-75, 77-88.)[2] He sent a kite on March 31, 2013, asking for his legal work back. (Pl. Decl.,

2    ECF No. 76 at 42 ¶ 6; Pl.'s Ex. 7, ECF No. 76 at 107.)[3] He filed another grievance against

3    Mullins on May 11, 2013. (ECF No. 76 at 4.; Pl.'s Ex. 5, ECF No. 76 at 90-102.) He asserts that

4    Mullins searched his cell again and did not log the search into the shift commander search log

5    book. (*Id.*) He filed emergency grievances on May 11, 2013, and on May 25, 2013, Mullins

6    searched Plaintiff's cell again. (ECF NO. 76 at 4; Pl.'s Ex. 6, ECF No. 76 at 104-105.)

7           Plaintiff maintains that these were not random searches, and if they were, Mullins would

8    have followed NDOC policy and would have logged them into the shift supervisor log book.

9    (ECF No. 76 at 3.) He asserts that once Mullins seized Plaintiff's legal work and grievances, it

10   became retaliatory. (ECF No. 76 at 3, Ex. 4, Ex. 16.)

11          Plaintiff states that on May 25, 2013, two days after he had gotten his legal work back,

12   Mullins searched his cell while Plaintiff was in the shower and when Plaintiff was being escorted

13   back to this cell he noticed his legal box and other personal property was in the trash. (ECF No.

14   76 at 9; Pl.'s Decl., ECF No. 76 at 4 ¶ 9.) Mullins refused to give him an unauthorized property

15   notification form, and did not mark the cell search in the log in violation of prison policy. (ECF

16   No. 76 at 10; Pl.'s Decl., ECF No. 76 at 4 ¶ 9.)

17          **4. Defendants' Reply**

18          Mullins asserts that he did not say he did not log the searches in the log book, but that he

19   could not recall whether he did or not. (ECF No. 77 at 3.) He maintains there is no causal

20   connection between the filing of grievances against Mullins and the cell searches. (*Id.*) He

21   reiterates that Plaintiff's legal work was taken the first time because he was storing it in a

22   laundry bag and using it as a weight, and on May 25, 2015, the box was removed because it was

23   not being used to store legal materials. (*Id.*)

24   ///

25   ///

26   _____

27          [2] Plaintiff's own grievance states that Mullins searched his cell on March 30, 2013, but two different
     officers, Silverstein and Mills had searched his cell on March 10, 2013. (ECF No. 76 at 70.)

28          [3] In response, Witter told him that he was using his legal work in his laundry bag as a weight, and could
     mail his unauthorized property items out at his expense. (ECF No. 76 at 107.)

**4. Analysis**

A retaliation claim under section 1983 requires that an inmate plaintiff establish: (1) the defendant took adverse action against him; (2) because of; (3) the inmate's protected conduct, and such action; (4) chilled the inmate's exercise of his First Amendment rights; and (5) the action did not reasonably advance a legitimate correctional goal. *Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015).

"The First Amendment guarantees a prisoner a right to seek redress of grievances from prison authorities as well as a right of meaningful access to the courts." *Id*. (citing *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995)).

An inmate must submit evidence, either direct or circumstantial, to establish a link between the exercise of constitutional rights and the allegedly retaliatory action. *Pratt v. Rowland,* 65 F.3d 802, 806-07 (9th Cir. 1995). A plaintiff's mere speculation that there is a causal connection is not enough to raise a genuine dispute of material fact. *See Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996).

Defendant Mullins submits evidence that his searches of Plaintiff's cell were conducted pursuant to NDOC policy that directs that an inmate's cell be searched *at a minimum* once a month. In addition, he asserts that he was not aware that Plaintiff had filed any grievances against him when he conducted the searches. He maintains that the March 30 search resulted in the designation of legal work as unauthorized because Plaintiff was storing it in his laundry bag and using it as a weight. He claims that in the May 11, 2013 search, he does not recall taking any blank grievance forms, and if he did he would not have taken them all but only those in excess of the number allowed. Finally, he asserts that as a result of the May 25, 2013 search a box marked legal was confiscated because it was not being used to store legal items.

Plaintiff retorts that Mullins was not conducting the searches pursuant to policy because they were not being logged into the cell search log book. Plaintiff produces no evidence that this was the case. He points to a discovery response from Mullins, but in that response Mullins did not say that he did not log the searches into the log book, but that he could not recall whether or not he had. (Pl.'s Ex. 17, ECF No. 76-1 at 85, Mullins response to Pl.'s Interrogatory 1.)

1    Plaintiff does not provide any evidence to refute Mullins' statement that when he

2    conducted the searches, he did not know that Plaintiff filed any grievances against him.

3    Moreover, there is no evidence to rebut that the legal work was taken on March 30, 2013 because

4    he was improperly storing it in his laundry bag which he was using as a weight. Plaintiff did not

5    address Mullins claim that he did not recall taking any blank grievances on May 11, 2013, and if

6    he did he would have only taken those considered as excess. Finally, he does not refute Mullins'

7    statement that the legal box was confiscated on May 25, 2013, because it was not being used to

8    store legal items. In sum, there is no evidence of a causal connection between Plaintiff filing the

9    grievances and the cell searches. Therefore, the court recommends that summary judgment be

10   granted in Mullins favor in Count I.

11   **B. Count II- Retaliation against Witter**

12       **1. Allegations**

13       In Count II, Plaintiff alleges that on February 23, 2013, he filed a small claims lawsuit in

14   Ely Justice Court against Witter, who is the property/mail room sergeant at ESP, for damaging

15   his television. (ECF No. 4 at 8.) On March 30, 2013, Mullins seized Plaintiff's legal work. (*Id.*)

16   On March 31, 2013, Plaintiff filed a kite requesting his legal work back. (*Id.*) He claims that

17   Witter refused to give the legal work back to him. (*Id.*) On April 3, 2013, Plaintiff filed another

18   small claims lawsuit against Witter for damaging his headphones. (*Id.*) On April 4, 2013,

19   Plaintiff filed a grievance against Witter. (*Id.*) On April 23, 2013, the justice court dismissed

20   Plaintiff's first small claims case against Witter. (*Id.*) Plaintiff alleges he was unable to file an

21   opposition to the motion to dismiss because Witter had seized his legal work. (*Id.*) On May 23,

22   2013, Warden Baker sent a caseworker to speak to Plaintiff about his grievances against Witter

23   and Mullins, and the next day his legal work was returned. (*Id.*)

24       Then, Plaintiff alleges that on May 28, 2013, Witter received legal mail that had been

25   sent to him. (*Id.* at 8-9.) He claims that on June 3, 2013, he went to the property room to separate

26   his property from that of his cellmate. (*Id.* at 9.) Then, on June 4, 2013, he went to the property

27   room again to retrieve his television, and at that time Witter gave him two unauthorized property

28   notification forms regarding five CDs and a fan, but she did not mention Plaintiff's legal mail.

1    (*Id*.) After he claims that Witter had his legal mail for nine days, on June 6, 2013, I received an

2    unauthorized mail notification. (*Id*.) He contends that on the same day, he sent Witter the yellow

3    copy of the unauthorized mail notification form asking that he be able to send the mail out at his

4    own expense. (*Id*.) On June 11, 2013, he received a pink copy of the unauthorized mail

5    notification stating "dispose of per inmate legal mail." (*Id*.) On June 16, 2013, he filed an

6    informal level grievance against Witter. (*Id*.) He asserts that on July 17, 2013, his second small

7    claims action against Witter was dismissed because Witter had disposed of his legal mail. (*Id*.)

8              **2. Defendants' Argument**

9              On March 30, 2013, a cell search was conducted of Plaintiff's cell and it was discovered

10   Plaintiff was storing his legal work in his laundry bag and using it as an exercise weight. (ECF

11   No. 66 at 2.) The legal work was eventually returned to him. (*Id*.)

12             On May 24, 2013, Plaintiff was issued an unauthorized mail notification because he

13   received a letter marked legal containing more than 10 enclosures from a non-legal source. (ECF

14   No. 66 at 3; ECF No. 66-4 at 5; Witter Decl., ECF No. 66-5 ¶¶ 8.)

15             On July 16, 2013, Witter asserts that she was working her assigned post as the

16   property/mail room sergeant and was processing inmate grievances. (ECF No. 66 at 3; Witter

17   Decl., ECF No. 66-5 ¶ 7; ECF No. 66-6.) She came across a grievance from Plaintiff claiming

18   staff had intentionally disposed of his unauthorized mail that contained legal work. (*Id*.) Witter

19   checked Plaintiff's property file and found that the mail room had received the yellow copy of

20   the unauthorized mail notification where Plaintiff initialed that the unauthorized mail should be

21   disposed of according to NDOC procedures. (ECF No. 66 at 3; ECF No. 66-4 at 5; Witter Decl.,

22   ECF No. 66-5 ¶ 9.) According to Witter, pursuant to that request, the mail was disposed of in

23   accordance with policy. (ECF No. 66 at 3; ECF No. 66-4 at 5; Witter Decl., ECF No. 66-5 ¶ 10.)

24             In his grievance, Plaintiff included another copy of the unauthorized mail notification

25   form that checked the option to have the mail shipped out at his expense. (ECF No. 66 at 3; ECF

26   No. 66-4 at 6; Witter Decl., ECF No. 66-5 ¶ 11; Ex. E.) Witter wrote a notice of charges against

27   Plaintiff because she claims Plaintiff sent the first form to the mail room with instructions to

28   dispose of the mail and once he received confirmation it was done, he filed a grievance against

the mail room and included a second form indicating that he would pay to have the mail sent out. (ECF No. 66-4; Witter Decl., ECF No. 66-5 ¶ 12.) He was found guilty of false pretenses. (ECF No. 66-4 at 11; Witter Decl., ECF No. 66-5 ¶¶ 13.)

### 3. Plaintiff's Response

Plaintiff claims that his legal work was seized during a cell search on March 30, 2013. (ECF No. 76 at 21; Pl. Decl., ECF No. 76 at 4 ¶ 5; Ex. 4.) On March 31, 2013, Plaintiff sent a request for his legal work back after it was sent to the property room. (ECF No. 76 at 21; Pl. Decl., ECF No. 76 at 4 ¶ 6; Pl.'s Ex. 7, ECF No. 76 at 107.) Witter responded that Plaintiff was using his legal mail in his laundry bag as a weight and he could mail the unauthorized items out at his expense. (*Id*.) Plaintiff filed a small claims action against Witter and Baker for damage to property on April 3, 2013. (ECF No. 76 at 7, 21; Pl. Decl., ECF No. 76 at 4 ¶ 7; Pl.'s Ex. 8, ECF No. 76 at 125.) On April 11, 2013, Witter and Baker filed a motion to dismiss. (Pl. Decl., ECF No. 76 at 4 ¶ 8; Pl.'s Ex. 8, ECF No. 76 at 125.)

Plaintiff filed a grievance against Witter on April 4, 2013 because she would not send his legal work back. (ECF No. 76 at 5, 21; Pl.'s Ex. 7, ECF No. 76 at 108-123.) He asserts that Witter's adverse action of withholding the legal work attempted to silence Plaintiff. (ECF No. 76 at 6.)

Next, Plaintiff claims that on May 28, 2013, Witter received legal mail from Plaintiff's mother. (ECF No. 76 at 21; Pl.'s Decl., ECF No. 76 at 44 ¶ 20.) On June 3, 2013, he was escorted to the property room to separate his personal property from that of his cellmate. (ECF No. 76 at 6, 21; Pl.'s Decl., ECF No. 76 at 44 ¶ 21.) On June 4, 2013, he was escorted back to the property room to receive his personal property and Witter gave Plaintiff two unauthorized property notification forms for five CDs and a fan. (ECF No. 76 at 6, 21; Pl.'s Decl., ECF No. 76 at 44 ¶ 24; Pl.'s Ex. 10, ECF No. 76 at 152-153.) On June 6, 2013, he states that he received the unauthorized mail notification form from Witter regarding legal mail she received from Plaintiff's mother, Elaine White, on May 28, 2013. (ECF No. 76 at 6, 21; Pl.'s Decl., ECF No. 76 at 44 ¶ 25.) He asserts that Witter withheld Plaintiff's legal mail for nine days before notifying him it was received. (*Id*.) He claims that she did this because the documents sent by

1   Plaintiff's mother included copies of Plaintiff's opposition in his small claims action against

2   Baker and Witter. (*Id.*)

3       Plaintiff states that on June 6, 2013, the same day he was notified about the legal mail, he

4   sent a response to Witter that he wanted to have the legal documents sent out at his own expense.

5   (ECF No. 76 at 7, 21; Pl.'s Decl., ECF No. 76 at 44 ¶ 25.) On June 11, 2013, Plaintiff received a

6   notice stating that the property had been disposed of. (*Id.*) On June 16, 2013, Plaintiff filed a

7   grievance regarding the mail. (*Id.*; Pl.'s Ex. 9, ECF No. 76 at 130-150.) He asserts that Witter's

8   disposal of the mail resulted in his small claims action being dismissed on July 17, 2013. (ECF

9   No. 76 at 7, 21; Pl.'s Ex. 8, ECF No. 76 at 125-129.) He maintains that Witter falsified Plaintiff's

10  response directing the property room to dispose of the mail. (ECF No. 76 at 7; Pl.'s Decl., ECF

11  No. 76 at 44 ¶ 26.)

12      In discovery Plaintiff asked Witter why she did not notify him of the asserted

13  unauthorized legal mail that was received on May 28, 2013, when he was in the property room

14  regarding other matters on two other occasions. (ECF No. 76 at 22; Ex. 21.) She responded that

15  when inmates are issued property, the mail room is not included and not consulted as to whether

16  or not there might be unauthorized mail in the mail room. (ECF No. 27 at 22; Ex. 21.) Plaintiff

17  maintains that Witter was in charge of both property and mail and could have given him the

18  unauthorized property notification for the mail as well. (ECF No. 27 at 23.)

19      **4. Defendants' Reply**

20      Defendants contend that Plaintiff's claim that Witter forged the unauthorized property

21  notice asking for the property to be disposed of is not supported by evidence and is blatantly

22  contradicted by the record. (ECF No. 77 at 4.)

23      **5. Analysis**

24      Count II has two components: (1) Plaintiff's claim that Witter retaliated against him

25  when she would not return the legal work he had stored in his laundry bag (confiscated during

26  the March 30, 2013 search); and (2) Plaintiff's claim that Witter retaliated against him when she

27  withheld his legal mail for nine days that was disposed of contrary to his wishes.

28

1    Regarding the first component, the refusal to return the legal work that was stored in the

2    laundry bag, Plaintiff's own grievance on the issue acknowledges that the work was taken

3    because it was being improperly stored in his laundry bag. (ECF No. 76 at 110.) The response to

4    his grievance indicates that Plaintiff told the officer he was using it as a weight. (ECF No. 76 at

5    111.) He was advised he could purchase legal boxes from the canteen or get them from the law

6    library if indigent to store legal work. (*Id.*) In the first level grievance response, it was reiterated

7    that the legal work was properly deemed unauthorized; nevertheless, Plaintiff was advised it

8    would be returned to clear the storage room and resolve the issue. (*Id*. at 114.)

9    In discovery, Witter stated that on or around March 31, 2013, an unauthorized property

10   notification form was received in the property room along with a state-issued laundry bag full of

11   paperwork, and the staff who took the paperwork noted it was being used as a weight bag and so

12   it was taken as unauthorized property. (*See* Pl.'s Ex. 17, ECF No. 76-1 at 125, Witter's response

13   to Pl.'s Interrogatory 2.)

14   Plaintiff provides no evidence to refute that the reason the legal work was being held was

15   because it had been deemed unauthorized. His claims of Witter's retaliatory motive are entirely

16   speculative, and summary judgment should be granted in favor of Witter insofar as this

17   component of Count II is concerned.

18   As to the second component of Count II, Witter maintains that the mail that came in from

19   Plaintiff's mother was withheld because it was not from a legal source and it contained more

20   than the allowed number of enclosures. She contends that the mail had been destroyed pursuant

21   to Plaintiff's instruction. She contends that only after Plaintiff was notified of its destruction did

22   he submit a manufactured instruction to have the mail sent out at his expense.

23   Plaintiff, on the other hand, claims that he did not receive the unauthorized mail form

24   until June 6, 2013, and that same day, he instructed that he wanted to send it out at his own

25   expense. On June 11, 2013, the day the mail was disposed of, he asserts that he received a copy

26   of the unauthorized mail form with the instruction to have the mail disposed of, which he

27   contends Witter forged. Insofar as a causal connection is concerned, Plaintiff points to the fact

28   that he had filed several small claims actions against Witter in April 2013, and Witter had filed

1   motions to dismiss in those actions which he contends he was unable to oppose around the time

2   Witter was withholding his mail because documents related to his opposition were contained

3   within that mail.

4          The court finds that a genuine dispute of material fact exists as to whether Witter

5   retaliated against Plaintiff by withholding and then disposing of his mail. Witter does not refute

6   that Plaintiff was engaged in protected conduct around the time the mail was withheld and

7   disposed. Plaintiff had filed several small claims actions against her, where Witter had filed a

8   motion to dismiss that required an opposition on Plaintiff's behalf. Witter signed the

9   unauthorized mail form (dated May 24, 2013). (ECF No. 66-4 at 5-6.) Witter presents no

10  explanation in response to Plaintiff's claim that he did not get the unauthorized mail form until

11  June 6, 2013. There are competing claims about what Plaintiff instructed Witter to do with the

12  mail: Plaintiff claims that on the day he get the unauthorized mail form he instructed Witter to

13  send it out at his expense, while Witter claims that Plaintiff instructed the mail staff to dispose of

14  the mail, and when that was done, sent the second form with the instruction to send it out. These

15  issues, along with timing of this activity in relation to the small claims actions, create a dispute

16  of material fact as to whether the mail was withheld because of Plaintiff's protected activity and

17  whether it was withheld in furtherance of a legitimate correctional goal.

18         As a result, summary judgment should be denied as to Plaintiff's First Amendment

19  retaliation claim in Count II against Witter as it relates to the mail sent by Plaintiff's mother.

20  **C. Count III- Excessive Force against Deeds, Rigney, Hammock and Montoya**

21         **1. Allegations**

22         In Count III, Plaintiff alleges that when Mullins searched his cell on May 25, 2013, he

23  demanded to speak with Baker. (ECF No. 4 at 10.) In response, Mullins called Deeds to extract

24  Plaintiff out of the cell. (*Id.*) During the extraction, Rigney, Hammock and Montoya came to

25  Plaintiff's cell. (*Id.*) Plaintiff alleges that while he was on his knees and in handcuffs, Rigney

26  repeatedly punched him on the left side of his face, Hammock grabbed his hair and slammed his

27  face repeatedly into the bunk, and Montoya repeatedly punched the right side of his face and

28  twisted his right arm over the back of his head. (*Id.* at 10-11.) He avers that he suffered

permanent damage to his right arm and received two black eyes. (*Id.*) He claims that Deeds stood in the doorway and watched the other officers assault him, failing to respond to Plaintiff's calls for help. (*Id.*)

### 2. Defendants' Argument

This is Defendants' version of events: On May 25, 2013, Plaintiff and his cellmate became argumentative and threatening after a search of their cell, and captured their wrist restraints and refused orders to uncover their window, turn on the light and come to the door to be restrained and to retrieve the cuffs. (ECF No. 66 at 5; Mullins Decl., ECF No. 66-3 ¶ 12; Deeds Decl., ECF No. 66-11.) Mullins called the desk sergeant to report the incident and defendant Deeds arrived at the unit along with Lieutenant David Drummond and members of the Correctional Emergency Response Team (CERT), officers Rigney and Hammock. (ECF No. 66 at 5; Mullins Decl., ECF No. 66-3 ¶ 13; Deeds Decl., ECF No. 66-11 ¶¶ 6-7.)

Efforts were made to temper the amount of force that needed to be used by first giving verbal orders. (Deeds Decl., ECF No. 66-11.) Deeds gave the inmates several commands to comply and they refused. (Deeds Decl., ECF No. 66-11 ¶ 8.) Deeds asked the inmates to uncover the cell door window and allow their restraints to be removed. (Deeds Decl., ECF No. 66-11 ¶ 8..) He gave two more orders, with no response. (*Id.*) Deeds left the tier and called Warden Baker to notify her of the situation and get authorization to assemble an extraction team. (Deeds Decl., ECF No. 66-11 ¶ 8; Baker Decl., ECF No. 66-10 ¶ 10.) Warden Baker told Deeds to send another supervisor to the unit to talk to the inmates and assemble teams for a two-man extraction just in case. (Deeds Decl., ECF No. 66-11 ¶ 9; Baker Decl., ECF No. 66-10 ¶ 10.) Lieutenant Drummond told Sergeant Oxborrow to try and talk to the inmates, but reported back that the inmates were still refusing to comply. (Deeds Decl., ECF No. 66-11 ¶ 10.) Warden Baker arrived at the unit to talk to the inmates and they still refused her orders to uncover the window and allow the restraints to be removed. (Deeds Decl., ECF No. 66-11 ¶ 11; Baker Decl., ECF No. 66-10 ¶ 10.) After repeated attempts to gain compliance were made, the use of force was authorized by Warden Baker, if necessary. (Deeds Decl., ECF No. 66-11 ¶ 11; Baker Decl., ECF No. 66-10 ¶ 10.)

Extraction teams were assembled, and before they entered the cell, Deeds again gave verbal commands to the inmates to be restrained. (Deeds Decl., ECF No. 66-11 ¶ 12; Montoya Decl., ECF No. 66-12 ¶ 7; ECF No. 66-13 at 3, 5, 6; Defs.' Ex. M (filed manually).) The inmates refused all orders. (*Id.*) Deeds advised them if they refused again chemical agents would be used. (Deeds Decl., ECF No. 66-11 ¶ 12.) They refused the order. (*Id.*) Deeds then applied chemical agents to the cell to gain compliance, but they still refused to comply. (Deeds Decl., ECF No. 66-11 ¶ 13; Montoya Decl., ECF No. 66-12 ¶ 7; ECF No. 66-13 at 2, 3, 5, 6.) A second burst of chemical agent was applied with orders for the inmates to come to the door to be restrained, but they refused the orders. (Deeds Decl., ECF No. 66-11 ¶ 13.) Deeds alternated between giving verbal orders and applying the chemical spray. (Deeds Decl., ECF No. 66-11 ¶ 13.) Plaintiff continued to refuse orders to be restrained. (*Id.*) At this point, Warden Baker authorized the use of force to enter the cell. (Deeds Decl., ECF No. 66-11 ¶ 14.)

Deeds signaled for the cell door to be opened and the extraction teams entered the cell. (Deeds Decl., ECF No. 66-11 ¶ 14; Montoya Decl., ECF No. 66-12 ¶ 8, ECF No. 66-13 at 2, 3, 5; Defs.' Ex. M.) Plaintiff and his cellmate were standing in the back of the cell swinging socks filled with soap, striking officers on the head, back and arms. (Deeds Decl., ECF No. 66-11 ¶ 15; Montoya Decl., ECF No. 66-12 ¶ 8; ECF No. 66-13 at 2, 3, 6.) They had also stacked boxes of property and legal work in front of the door to try to trip officers entering the cell. (Deeds Decl., ECF No. 66-11 ¶ 15; ECF No. 66-13 at 2, 6; Defs.' Ex. M.) While Plaintiff was hitting officers, his cellmate grabbed hold of Officer Nathan Mingo's helmet strap and twisted it so as to choke him. (ECF No. 66-13 at 2.) Officer Richard Adams and Officer Steve Collard fought Plaintiff's cell mate to make him let go of Officer Mingo. (*Id.*) It took several hits to the cellmate's face before he released Officer Mingo. (*Id.*)

Plaintiff's arms and legs were restrained but he was not punched in the face. (ECF NO. 66-13 at 2, 3; Defs.' Ex. M.) Plaintiff and his cellmate were subdued and removed from the cell. (Deeds Decl., ECF No. 66-11 ¶ 16; Montoya Decl., ECF No. 66-12 ¶ 9, ECF No. 66-13 at 3, 5; Defs.' Ex. M.) Plaintiff was escorted to the upper left shower to wait while his cellmate was examined by medical. (Deeds Decl., ECF No. 66-11 ¶ 16; ECF No. 66-13 at 3, 6.) Plaintiff

attempted to incite other inmates and was verbally abusive to staff. (Deeds Decl., ECF No. 66-11 ¶ 16; ECF No. 66-13 at 6; Defs.' Ex. M.) Plaintiff was then escorted to the hallway to be evaluated by medical. (Deeds Decl., ECF No. 66-11 ¶ 16; Montoya Decl., ECF No. 66-12 ¶ 9; ECF No. 66-13 at 3, 6; Defs.' Ex. M.) The medical report completed almost immediately after the extraction does not mention any injuries to Plaintiff's head or face. (ECF No. 67-1 at 6.) His only complaint was that his right arm hurt and he believed it was broken. (ECF No. 66-13 at 3; ECF No. 67-1 at 6.) He was to be admitted to the infirmary, given an ibuprofen pain pack and was advised to apply ice to the affected area for seventy-two hours. (ECF No. 67-1 at 3, 6.) He went to the hospital for evaluation of his right arm. (ECF No. 67-1 at 3.) This was his only complaint. (ECF No. 67-1 at 9.) No other injuries were observed. (ECF No. 67-1 at 10.) He was assessed with a sprained right elbow, muscle strain to the right forearm and a contusion to the right forearm. (ECF No. 67-1 at 4-5.) He was discharged in good and stable condition. (ECF No. 67-1 at 10.)

Defendants assert that there was a need to use force because of the refusal to comply with orders, and the amount of force used was light given that Plaintiff was attacking the officers. (ECF No. 66 ay 14.) The officers perceived a real threat from Plaintiff and his cellmate because the window was blocked and they had captured their cuffs which could be used as a weapon, and then when the inmates began to attack the officers. (*Id*. at 14-15.)

**3. Plaintiff's Response**

Plaintiff claims that when Mullins took his legal work on May 25, 2013, he asked for an unauthorized property form, which Mullins refused, and also asked to speak to the shift commander, which Mullins also refused. (ECF No. 76 at 10.) He asked to speak to Warden Baker, and Mullins closed Plaintiff's door flap and called defendants Deeds and Rigney. (*Id*.) Plaintiff acknowledges that he refused to be un-cuffed until he was allowed to speak with Warden Baker. (*Id*.) Warden Baker was called and came to speak with Plaintiff and his cellmate. (*Id*.) Plaintiff expressed his frustration with Mullins and the cell searches. (*Id*.) Warden Baker asked Plaintiff to let Deeds un-cuff him, and said she would talk to Mullins about the situation.

1    (*Id.*) Plaintiff asserts that he did not feel safe with Deeds. (*Id.*) Baker became frustrated with

2    Plaintiff and gave Deeds the authority to extract Plaintiff and his cellmate. (*Id.*)

3        Plaintiff asserts that Rigney, Montoya and Hammock entered his cell and attacked him

4    and his cellmate, using excessive force while Plaintiff was in full restraints by bending his arm

5    behind his head. (ECF No. 76 at 10; Pl.'s Decl., ECF No. 76 at 43 ¶ 11; Daniels Decl., ECF No.

6    76 at 45 ¶ 5.)[4] He was hit in the face numerous times while Hammock held him down on the

7    bunk, grabbed his hair and slammed his face into the bunk. (*Id.*) Rigney and Montoya took turns

8    punching Plaintiff in the face. (ECF No. 76 at 10; Pl.'s Decl., ECF No. 76 at 43 ¶¶ 12-13.) Deeds

9    just stood by and watch while he called out that he was in pain. (ECF NO. 76 at 10; Pl.'s Decl.,

10   ECF No. 76 at 43 ¶ 14.) He claims that he endured ten minutes of this, and Deeds finally called

11   off the officers and placed Plaintiff in the shower. (ECF No. 76 at 10.) He told the nurse that the

12   officers had punched him in the face and slammed his head into the bunk. (*Id.* at 12.) He

13   contends that he did not resist the officers and was in full restraints. (*Id.* at 35.) He maintains that

14   he could not have had a weapon because he was in restraints, and did not attack the officers.

15   (ECF No. 76 at 36; Pl.'s Decl., ECF No. 76 at 43 ¶ 15; Daniels Decl., ECF No. 76 at 45 ¶ 6.)

16       Plaintiff was taken to the hospital for his injuries that same day. (Pl.'s Decl., ECF No. 76

17   at 43 ¶ 18.) On May 28, 2013, he filed an emergency grievance asking that photos be taken of his

18   injuries, including two black eyes and a bruised right arm. (ECF No. 76 at 36; Pl.'s Decl., ECF

19   No. 76 at 43 ¶ 19; Pl.'s Ex. 27, ECF No. 76-1 at 183.) He was instructed that it was not an

20   emergency and that he should kite or grieve the issue through proper channels. (*Id.*)

21       He filed a grievance regarding his injuries and the lack of treatment on June 6, 2013.

22   (ECF No. 76 at 12; Pl.'s Ex. 13, ECF No. 76-1 at 15-26.)[5] On August 26, 2013, he filed a

23   grievance against Rigney, Montoya, Hammock and Deeds regarding their "campaign of

---

[4] Aaron Daniels was Plaintiff's cellmate on the date of the alleged excessive force incident and asserts that he witnessed Officers Rigney, Montoya and Hammock punch Plaintiff in the face and slam his head into the bottom bunk, and that he heard Plaintiff yelling out in pain to Deeds.

[5] The grievance response states that Plaintiff was seen by Dr. Koehn at June 21, 2013, and was referred to an orthopedist which needed to be approved by the Utilization Review Panel, and he was also ordered Naprosyn for his pain. (ECF NO. 76-1 at 17.)

1   harassment" against him. (ECF No. 76 at 12; Pl.'s Ex. 14, ECF No. 76-1 at 28-43.) The

2   grievance was forwarded to the Inspector General for review. (*Id.*) He eventually saw

3   Dr. Gedney, and was given an arm sleeve and was ordered to be placed in belly chains. (ECF No.

4   76 at 12.)

5        Plaintiff also claims that his mother and sister came to visit him on June 3, 2013, and

6   witnessed his injuries including two black eyes, knots on his head and face and disfigurement to

7   his right arm. (ECF No. 76 at 35; Pl.'s Decl., ECF No. 76 at 44 ¶ 22; Decl. of Elaine White, ECF

8   No. 76-1 at 174 ¶ XIII (stating that his arm was black, blue, green and twisted, and he

9   complained of pain, and his forehead had knots on it, and he had two black eyes); Decl. of

10  Glenda White Bryant, ECF No. 76-1 at 177 ¶ XII (stating that Plaintiff had two black eyes, a

11  swollen face and arm); Decl. of Margaret Rogers, ECF No. 76-1 at 179 ¶ VII (stating Plaintiff's

12  arm looked broken, his eyes were blood shot, he had two black eyes and was in a lot of pain).)

13       **4. Defendants' Reply**

14       Defendants contend that Plaintiff admits he and his cell mate refused orders to allow their

15  restraints to be retrieved. (ECF No. 77 at 5.) In addition, they assert that Plaintiff's version of the

16  cell extraction is controverted by the evidence. (*Id.*) Plaintiff says he was subjected to ten

17  minutes of battery by Defendants, but according to the video from the time the cell door is

18  opened until the time Plaintiff is removed is approximately five minutes. (*Id.*) Plaintiff did not

19  have injuries to his face and there was no blood on his clothing. (*Id.*) The hospital records also

20  showed no injuries to the face, head or neck. (*Id.*) Defendants contend that Plaintiff cites to zero

21  evidence that contradicts the video or medical evidence. (*Id.*)

22       **5. Analysis**

23       The Eighth Amendment prohibits the imposition of cruel and unusual punishment.  U.S.

24  Const.  amend.  VIII. It "embodies broad and idealistic concepts of dignity, civilized standards,

25  humanity, and decency." *Estelle v.  Gamble*, 429 U.S. 97, 102 (1976) (citation and internal

26  quotations omitted). The "unnecessary and wanton infliction of pain...constitutes cruel and

27  unusual punishment forbidden by the Eighth Amendment." *Id*. (quoting *Whitley v.  Albers*, 475

28  U.S. 312, 319 (1986)).

1    "[W]henever prison officials stand accused of using excessive physical force in violation

2    of the [Eighth Amendment], the core judicial inquiry is...whether force was applied in a good-

3    faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."

4    *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992); *see also Whitley*, 475 U.S. at 320-21; *Watts v.*

5    *McKinney*, 394 F.3d 710, 711 (9th Cir.  2005); *Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th

6    Cir.  2003). "When prison officials maliciously and sadistically use force to cause harm,

7    contemporary standards of decency are always violated." *Hudson*, 503 U.S. at 9 (citing *Whitley*,

8    475 U.S. at 327).

9    In determining whether the use of force is excessive, courts are instructed to examine

10   "the extent of the injury suffered by an inmate[;]" "the need for application of force, the

11   relationship between that need and the amount of force used, the threat 'reasonably perceived by

12   the responsible officials,' and 'any efforts made to temper the severity of the forceful response.'"

13   *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321).

14   An inmate need not establish serious injury; however, the lack of serious injury is

15   relevant to the Eighth Amendment inquiry. *See Wilkins v.  Gaddy*, 130 S.Ct.  1175, 1178 (2010).

16   "The extent of injury may also provide some indication of the amount of force applied." *Id.*

17   That being said, not "every malevolent touch by a prison guard gives rise to a federal

18   cause of action...The Eighth Amendment's prohibition of 'cruel and unusual' punishments

19   necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided

20   that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S.

21   at 9-10 (quoting *Whitley*, 475 U.S. at 327); *see also Wilkins*, 130 S.Ct. 1178 ("An inmate who

22   complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a

23   valid excessive force claim." (citing *Hudson*, 503 U.S. at 9)). "Injury and force, however, are

24   only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is

25   gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely

26   because he has the good fortune to escape without serious injury." *Wilkins*, 130 S.Ct. at 1178-79.

27   If the nature of the injuries is more than *de minimis*, but still "relatively modest," the inmate's

28   damages will likely be limited. *See id.* at 1180.

1    The court has reviewed all of the evidence submitted by the parties relative to this claim,

2    including the two videos, and finds that a genuine dispute exists as to material facts concerning

3    whether Defendants used excessive force during the May 25, 2013 cell extraction.

4    Plaintiff concedes that he would not surrender his restraints following his cell search on

5    May 25, 2013. The video footage makes clear that the officers gave Plaintiff and his cellmate

6    several opportunities to comply and come to the door to be restrained. When these efforts proved

7    fruitless, the officers entered the cell to restrain the inmates. What is not clear is what happened

8    once the officers were inside the cell. The first video does not show anything material that went

9    on in the cell. The second video does depict some of the activity inside the cell. At various times,

10   officers can be seen punching either inmate in the cell, but because of the number of officers

11   surrounding the inmates, it is impossible to see what the inmates were doing to determine

12   whether the force used was justified or not.

13   Defendants claim that Plaintiff was swinging a sock with soap inside as a weapon against

14   the officers. Plaintiff disputes this, and claims he was restrained and did not resist the officers.

15   The court cannot discern from the video footage whose version of events is correct.

16   While Plaintiff claims that he sustained ten minutes of beating by the officers, the video

17   demonstrates that from the time the door was opened until Plaintiff was escorted out of the cell

18   was approximately four minutes. The time period asserted by Plaintiff may be contradicted by

19   the video, but what occurred during those four minutes remains in dispute. It is not the court's

20   province to weigh Plaintiff's credibility at the summary judgment stage. Therefore, the court

21   may not decide that because Plaintiff overestimated the time he allegedly was subject to beating,

22   that he was not beaten at all.

23   Defendants claim that Plaintiff suffered no injuries as a result of the incident, but at the

24   same time acknowledge that Plaintiff complained that his arm was broken, was subsequently sent

25   to the hospital for evaluation of his arm, and was diagnosed with a sprained arm. Defendants

26   assert that Plaintiff suffered no other injuries to his head or face. They point to the unusual

27   occurrence report filled out after the incident which makes no mention of injuries to the head or

28   face, and the records from the hospital which similarly lack a reference to head or facial injuries.

1    Contrary to Defendants' contention, Plaintiff does in fact present evidence to dispute that

2    argument in the form of his own declaration which states that he had knots on his head and two

3    black eyes following the incident, and the corroborating declarations of his cellmate and family

4    members.

5          For these reasons, the court recommends that summary judgment be denied as to the

6    Eighth Amendment excessive force claim in Count III against Rigney, Montoya, Hammock and

7    Deeds.

8    **D. Count IV-Retaliation against Moore**

9          **1. Allegations**

10         In Count IV, Plaintiff alleges that on January 11, 2013, his disciplinary segregation ended

11   and he was admitted for a full classification review before Moore. (ECF No. 4 at 12.) He was

12   processed for transfer to Lovelock Correctional Center; however, he asserts that Moore kept him

13   in maximum security between January 11, 2013 and May 25, 2013 because Plaintiff filed

14   grievances against prison officials (to which Moore had responded). (*Id.*)

15        **2. Defendants' Argument**

16         Plaintiff was seen at a full classification hearing for a possible custody reduction on

17   January 7, 2013. (ECF No. 66-7 at 2; Moore Decl., ECF No. 66-8 ¶ 6.) The committee, including

18   defendant Moore, recommended that Plaintiff be transferred to LCC, a medium custody facility.

19   (ECF No. 66-7 at 2, Moore Decl., ECF No. 66-8 ¶ 7.) The classification committee could only

20   make a recommendation for transfer, and the Offender Management Division (OMD) would

21   have to give final approval and effectuate the transfer. (Moore Decl., ECF No. 66-8 ¶ 8; ECF No.

22   66-9 at 2.) OMD did not evaluate the transfer until August 30, 2013, and it was determined

23   Plaintiff needed medical attention at Northern Nevada Correctional Center (NNCC). (ECF No.

24   66-7 at 2; Moore Decl., ECF No. 66-8 ¶ 9.) Defendant Moore maintains there is no evidence he

25   did anything to stop Plaintiff's transfer to LCC. (ECF No. 66-8 ¶ 10.)

26

27

28   ///

**3. Plaintiff's Response**

Plaintiff acknowledges the statement by Defendants that the transfer had to be approved by OMD, but asserts that Moore still had a responsibility to protect Plaintiff's liberty interest by properly addressing his grievances. (ECF No. 76 at 26.)

**4. Analysis**

Plaintiff's response asserts that Moore was deficient in responding to Plaintiff's grievances. This was not a claim that was allowed to proceed against Moore. The only claim against Moore is regarding Moore not making sure Plaintiff was transferred to LCC. Defendants have presented evidence that Moore, as part of the classification committee, recommended Plaintiff's transfer to LCC, but final approval had to come from OMD. Plaintiff has not presented a genuine dispute as to any material fact in response to Defendants' motion concerning this claim. Therefore, summary judgment should be granted in Moore's favor.

**E. Supervisory Liability-Baker**

**1. Allegations**

The court found Plaintiff's complaint states a colorable supervisory liability claim against Baker because he alleges she knew about all of the events alleged in the complaint and ordered caseworkers to talk to Plaintiff about the events. (ECF No. 3 at 7-8.)

**2. Baker's Argument**

Baker asserts that she did not play a role in the cell searches or confiscation of legal mail. On April 23, 2013, ESP received a call from Plaintiff's mother stating she was concerned about her son's safety as he felt he was being threatened by ESP staff. (ECF No. 66-7 at 2; Baker Decl., ECF No. 66-10 ¶ 6.) Baker requested that a caseworker speak with Plaintiff about his concerns. (Baker Decl., ECF No. 66-10 ¶ 6.) The caseworker spoke with Plaintiff on April 29, 2013, and he stated he did not have any concerns.(ECF No. 66-7 at 2; Baker Decl., ECF No. 66-10 ¶ 6.)

On May 22, 2013, Baker received a letter from Plaintiff's mother stating her son feared for his safety. (ECF No. 66-7 at 2; Baker Decl., ECF No. 66-10 ¶ 8.) Baker sent Correctional Officer Sandoval and Correctional Sergeant Gittere to speak with Plaintiff. (ECF No. 66-7 at 2;

Baker Decl., ECF No. 66-10 ¶ 8.) Plaintiff said he felt he was being retaliated against because his cell was being searched more than it should be. (ECF No. 66-7 at 2; Baker Decl., ECF No. 66-10 ¶ 8.) It was noted that Plaintiff had filed grievances on this issue and he was advised the matter had been referred to the Inspector General's Office for investigation. Sandoval contacted Witter about the laundry bag that had been taken. (ECF No. 66-7 at 2.) He stated that a laundry bag full of his work had been deemed unauthorized because it was being used as a weight bag. (*Id.*) Plaintiff was told his laundry bag and legal work would be returned and was admonished against using his laundry bag to store his legal work. (*Id.*) He was asked if he wanted to move to another unit while these issues were being addressed, and he indicated several times that he did not and said: "I will be fine here." (ECF No. 66-7 at 2; Baker Decl., ECF No. 66-10 ¶ 8.) Despite this, Baker decided to transfer Plaintiff to another cell. (Baker Decl., ECF No. 66-10 ¶ 9.) Before the transfer could be completed, a cell extraction occurred on May 25, 2013. (*Id.*)

### 3. Plaintiff's Response

First, Plaintiff asserts that in every grievance Plaintiff filed asserting retaliation against Mullins, Baker and Moore denied the grievances as vexatious and frivolous, so they knew what Plaintiff was accusing Mullins of and failed to act. (ECF No. 76 at 5, 28.)

Second, Plaintiff claims that Baker knew of Plaintiff's claims that Witter was withholding his legal documents and then disposing them, and went along with these actions. (ECF No. 76 at 7, 28.)

He disputes that he told Moore or Sandoval that he did not have issues with Mullins or that he would be fine staying in the unit with Mullins. (Pl.'s Decl., ECF No. 76 at 42-43 ¶ 10.)

### 4. Defendants' Reply

Defendants assert that Baker had no role in the searches of Plaintiff's cell or confiscation of his legal mail. (ECF No. 77 at 5.) When Plaintiff's mother called and wrote Baker, she asked caseworkers and other staff to speak to Plaintiff, and Plaintiff indicated he would be fine. (*Id.*) Even when Plaintiff said he did not want to move units, Baker decided he should be moved for his safety. (*Id.* at 5-6.)

1

### 5. Analysis

2      Preliminarily, the court has recommended that summary judgment be granted as to the

3  retaliation claims in Counts I, II (as to one claim), and IV. There can be no supervisory liability

4  for Baker for those claims when there is no underlying constitutional violation. Therefore,

5  summary judgment should be granted in Baker's favor insofar as the supervisory liability claim

6  is predicated on those counts. The court must determine whether or not Baker is entitled to

7  summary judgment with respect to the remaining claims.

8      "Under section 1983, supervisory officials are not liable for actions of subordinates on

9  any theory of vicarious liability." *Hansen v. Black*, 885 F.2d 642, 645-46 (9th Cir. 1989).

10  Instead, a supervisor is liable only if: (1) he or she is personally involved in the alleged

11  constitutional deprivation, or (2) there is "sufficient causal connection between the supervisor's

12  wrongful conduct and the constitutional violation." *Id*. at 646.

13      The causal connection can include: "1) [the supervisor's] own culpable action or inaction

14  in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional

15  deprivation of which a complaint is made; or 3) conduct that showed a reckless or callous

16  indifference to the rights of others. *Lemire v. Cal. Dep't of Corr.*, 726 F.3d 1062, 1085 (9th Cir.

17  2013) (citations and internal quotation marks omitted). In addition, "[s]upervisory liability exists

18  even without overt personal participation in the offensive act if supervisory officials implement a

19  policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the

20  moving force of a constitutional violation.'" *Crowley v. Bannister*, 734 F.3d 967, 977 (9th Cir.

21  2013 (quoting *Hansen*, 885 F.2d at 646).

22      Insofar as the remaining First Amendment retaliation claim against Witter is concerned,

23  Baker was not directly involved in the withholding of Plaintiff's mail. There is no evidence that

24  she was deficient in the training, supervision or control of her subordinates. When she was

25  notified of Plaintiff's complaints, she sent caseworkers and correctional officers to address

26  Plaintiff's concerns. Nor does her conduct show reckless or callous indifference to Plaintiff's

27  rights. Finally, there is no evidence of a policy to retaliate against inmates by withholding mail.

28

1    Therefore, Baker should be granted summary judgment insofar as the supervisory liability claim

2    is predicated on the retaliation claim against Witter in Count II.

3           With respect to the Eighth Amendment excessive force claim, the evidence demonstrates

4    that Baker authorized the cell extraction, but she did not participate in the actual cell extraction.

5    The question presented to the court is whether her act of authorizing the extraction subjects her

6    to liability.

7           Again, it is undisputed that Baker did not actually participate in the cell extraction on

8    May 25, 2013. Therefore, the court's inquiry turns to whether there was sufficient causal

9    connection between her actions and the asserted constitutional violation.

10          There is no evidence in the record that Baker was deficient in training, supervision or

11   control of her subordinates. It cannot be that she acquiesced in the constitutional deprivation

12   because she could not have anticipated exactly how the officers would conduct themselves once

13   inside the cell. The evidence demonstrates that Baker gave authority for the cell extraction; under

14   the circumstances where Plaintiff and his cellmate were admittedly failing to follow orders to

15   come to the cell door to be restrained following several attempts, there is no evidence that this

16   decision exhibited a reckless or callous indifference to Plaintiff's rights. Finally, this is not a case

17   where Plaintiff asserts or presents evidence that Baker had a policy of allowing officers to utilize

18   excessive force.

19          With no basis to hold Baker liable for the Eighth Amendment excessive force violation,

20   the court recommends that summary judgment be granted in her favor.

21   **F. Qualified Immunity**

22          The court need only address Defendants' qualified immunity argument insofar as the

23   remaining First Amendment retaliation claim against Witter and Eighth Amendment excessive

24   force claim against Rigney, Montoya, Hammock, and Deeds is concerned.

25          "Qualified immunity shields federal and state officials from money damages unless a

26   plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and

27   (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-*

28   *Kidd*, 131 S.Ct.  2074, 2080 (2011) (quoting *Harlow v.  Fitzgerald*, 457 U.S. 800, 818 (1982));

*see also Chappell v. Mandeville*, 706 F.3d 1052, 1056 (9th Cir. 2013) (citation omitted) ("Qualified immunity protects government officials from civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.");Padilla v. Yoo*, 678 F.3d 748, 758 (9th Cir.  2012); *Pearson v.  Callahan*, 555 U.S. 223 (2009). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231.

Here, the court has found a genuine dispute as to material facts exists as to whether a violation of the Constitution occurred in connection with these claims; therefore, the court cannot determine whether Defendants are entitled to qualified immunity at this time. *See Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003).

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an order **GRANTING IN PART AND DENYING IN PART** Defendants' motion for summary judgment (ECF No. 66) as follows:

(1) The motion should be **GRANTED** as to the First Amendment retaliation claim against Mullins in Count I;

(2) The motion should be **GRANTED** as to the First Amendment retaliation claim against Witter in Count II that is predicated on the withholding of legal mail stored in Plaintiff's laundry bag;

(3) The motion should be **DENIED** as to the First Amendment retaliation claim against Witter in Count II that is predicated on the withholding of mail sent in by Plaintiff's mother;

(4) The motion should be **DENIED** as to the Eighth Amendment excessive force claim in Count III against Rigney, Montoya, Hammock and Deeds;

(5) The motion should be **GRANTED** as to the retaliation claim in Count IV against Moore; and

(6)  The motion should be **GRANTED** as to the supervisory liability claim against Baker.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

DATED: December 4, 2015.

_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE